May it please the Court, I'm Lee Davis and I'm here today on behalf of Appellant Nygul Gonzalez. For the Court's information, Mr. Poe and I have kind of split what we think are probably the two most critical arguments for the Court. I was going to focus on the Travel Act count and Mr. Poe was going to focus on the money laundering or attempted money laundering count. I'm happy to answer any questions the Court has about the attempted money laundering count, but I think Mr. Poe has devoted some prep to that and so he might be better positioned there and I know he's intending to address that with the Court. This is certainly an unusual case. It begins with a 17-year-old, 18-year-old and 19-year-old kid down in South Texas going to go on a joyride and pick up some money, which admittedly at least a couple of them thought was probably drug money, drug proceeds of some sort. It ultimately wound up after about a day or day and a half of road trip to their being apprehended by an FBI SWAT team in a Home Depot parking lot on the north side of Fort Worth. The three substantive charges were conspiracy to possess extortion proceeds, a conspiracy to violate the Travel Act, and then attempted money laundering. And the key actor here, or the ringleader and really bad culprit here, was Mr. Cabrera who pled out, cooperated with government, got a 14-month sentence. He was the gentleman who was in contact with the fellow Pancho down in Mexico trying to arrange this money pickup. The relationship between Cabrera and Pancho was pretty long and distinguished if you look at Government Exhibit 8, which are the WhatsApp messaging messages between them. And of course there's some evidence in the record, both trial and sentencing of other things that were on Cabrera's phone. They have a long history of talking about drug dealing and cartel activities and this extortion money, which was a kidnapping ransom deal out of Mexico. Apparently he didn't have a car, so he asked his friend Albert Gonzalez, you know, can you drive? Well, apparently he doesn't have a car either, so let's call Jose, the 17-year-old. Well, no, but okay, well, we know Nigel, my client, he's finally got a car. So... Davis, you're going to run out of time in a hurry if you don't get to your legal points. Yes, Your Honor, and I hate to spend so much time on the backdrop, but it's an unusual and bizarre case. With respect to the Travel Act count here, there are several problems with that. You know, number one, there's no continuing business enterprise with respect to what my client or Mr. Poe's client did. I thought there were text messages or emails or other things about other activities, related activities, not just this one discrete transaction. Those all existed solely between Cabrera, Fernando Cabrera, who was the defendant in this case who pled out, and this Poncho fellow down in Mexico. Those were all between the two of them, and, yes, a lot of those talk about drug dealing and the potential for drug dealing, but there never was any drug dealing that Cabrera did for Poncho, and Mr. Poe did identify only the messages in Government's Exhibit 8 that pertain to the activity in this case. Defense Exhibit 1 is Government's Exhibit 8 with only the messages pertaining to this trip to Fort Worth to pick up the extortion money highlighted. So the problem here is the district court admitted over our objection, several objections, all these text messages that prove up this talked about drug dealing by Cabrera and Poncho. No connection with that to my client or Mr. Poe's client, no indication that they really have any or very much knowledge about that at all, and, of course, none of that ever came to fruition. You know, the underlying conduct here was some kids hooked up with Cabrera, and they're going to go on basically a joyride to Fort Worth, pick up this money, and at alternate times they talk about splitting it up amongst themselves, 500 bucks each, 1,000 bucks apiece. We'll go on a shopping spree at the Galleria. Maybe we'll just steal all of it, although stealing money from a Mexican drug cartel, probably not a real good idea, but that was all that was going on here. And so you don't have these defendants connected to, much less participating in, what Cabrera and Poncho had talked about with respect to any kind of drug dealing. And, of course, this was, in fact, an extortion scam, not drug dealing. Anderson and Gonzalez and probably Torres as well just assumed that that's what they were going to do. What else are we going to go pick up 20,000 in cash in a Home Depot parking lot for? That's not how my clients pay me, and that would certainly be consistent with that sort of activity. And so that's the problem here is there's not a continuing business enterprise. Even if you can find that the two of them participated, or Cabrera and Poncho were in some kind of continuous business enterprise, there's nothing that is going on here. And so, you know, obviously a challenging case for the government to charge because of the way it transpired, but the whole point that we went to trial on is simply because we did not believe that this conduct, which really was not disputed, met the elements of any of these offenses. And with the limited time, I'll segue into the conspiracy to possess extortion proceeds. That gets to a statutory interpretation question. Does a defendant have to know that those proceeds that he is conspiring to possess are extortion proceeds or just illegally obtained proceeds? And obviously the government's position is that, well, it's sufficient to show that they were just illegally obtained however they were. But, you know, obviously for the reasons we put in the brief, there are some issues with that. It can be fairly read to be extortion proceeds. It's certainly in that subchapter of the code. Could have been placed any number of other places. So, unfortunately, that's an issue of first impression for this court and best we can tell any court in the country. So, thank you. Thank you, Mr. Davis. You've saved time for rebuttal. Mr. Poe. Please support, you know, despite the government's best efforts to put a square peg in a round hole, this money laundering count, it fails for multiple reasons. First, there is, you know, this is a steam provision under 1956A3. So, the government has to represent to the defendants that this is the proceeds of specified unlawful activity. Here, there was no representation made to Albert Gonzalez and Nigel Anderson. The only representation that the government made that this was extortion proceeds was to a guy in Mexico named Poncho who these two defendants had no contact with and did not communicate with during this offense. And so, the government wants to rely on the fact that, well, the statute says that they don't have to represent to the defendants. They can represent to somebody else. Well, that flies in the face of the whole purpose of the steam provision. But even if the government is right on that, the representation that the government agent made to Poncho was insufficient. So, this court has repeatedly said that in order for a money laundering transaction to occur, the SUA, the specified unlawful activity, has to be completed. This was not an investigation that starts off as a steam operation by the FBI. This starts off as an investigation in which the FBI is trying to catch people that are extorting and potentially kidnapping people in Mexico and holding their families hostage for extortion money. So, what relief are you asking us to give you? I'm arguing that the money laundering count, the evidence was insufficient that it should be an acquittal for that count. And where does that leave you? Well, I also believe, I mean, I would have to butt yourself with Mr. Davis here about count two, the travel act, but I believe that's insufficient as well. But it would leave, at least as far as Mr. Gonzalez is concerned, it would leave count one. Count one, I mean, I believe that Judge O'Connor, while I moved to dismiss that count, I believe that he wrote a very good opinion that, frankly, I wasn't able to articulate or argue against here before you, so I wasn't going to waste your time with a frivolous argument. So, that would, I believe that counts two and three should be held as insufficient and an acquittal for those two counts. But going back to the representation made by the government, like, they're saying in this representation that, hey, this money is the money that we owe you for the extortion. So whenever Jose Torres gets out of the car to try to pick up that bag of money at that Home Depot parking lot, that pickup of the money just completes the SUA. So the government never made a representation, as the statute calls for, that says that it was the proceeds of specified unlawful activity. It does not become proceeds until the money is actually picked up. And that is consistent with the Gaten case, United States v. Gaten, in which this Court, I believe, Judge Smith, you actually authored that opinion in which it says that the money, in that case, was drug trafficking, the money did not become the proceeds of drug trafficking until Maceias, in that case, who was the drug dealer, had received it. And so that, without that representation, therefore, because there's no SUA that's been completed, there's no financial transaction. The pickup or the attempted pickup of this money is not a transaction in which these defendants participated in. And, frankly, when you look at the record, when it got time to get out of the car to actually fish or cut bait to see if they're going to pick up that money, Albert Gonzalez refused to get out of the car. Nigel Anderson refused to get out of the car. Fernando Cabrera refused to get out of the car to get it. The only person who agreed to get out of the car to get it was Jose Torres, who was never charged. So the government, again, did not charge this as a conspiracy, but yet they're wanting to take the liability of Jose Torres and now put it over on Albert Gonzalez and Nigel Anderson. And then, lastly, when you look at the concealment aspect of it, the government at trial argued that the reason why they meet that element, that they conducted or attempted to conduct this of the property, was because they were going to go on this spending spree. Well, then now we get on appeal and the government is now is changing gears and they're saying, well, maybe not so much that, but let's go back to the original plan, which was when Fernando Cabrera was talking with Poncho via this WhatsApp message, and he talked about how they were going to try to launder the money through some credit cards and a bank account. Well, when you compare that WhatsApp message to the actual testimony at trial, Fernando Cabrera said that basically that was just the ruse in order for him to agree to let him come pick up the money. The entire intent from the entire moment that they left the valley to come up to Fort Worth was to steal the money so that they could spend it for however they want. And so when you look at the cases that deal with concealment and whether or not transactions and spending is actually concealment, you look at the that, you know, the concealment must be the purpose, not just the effect of the transactions. You know, and, and Dimit, you know, arguably is looking at the provision under 1956 A1B Romanet I, which deals with virtually the same language that we have here, but it has in front of it designed to conceal disguise. We don't have the design language here, but we do have the intent. So it's very analogous to the situation that we have here. And so in looking at the Dimit case, you know, the design requirement, the court said was distinguishes that the purpose of it is distinguishes money laundering from innocent acts of mere spending. And that's all we have here. We have four kids who thought they were able to going to steal $20,000 from some guy in Mexico that might've been drug money, but they were never going to come after them. And they could go on a shopping spree in order to buy some clothes. You know, the government wants to say that, well, they all knew about this agreement to go longer, the funds through this bank account. Well, that argument falls flat. When you look at the evidence of before they even, and that text message, they're saying, Hey, of the $20,000, you're going to keep 10%. You'll keep $2,000 of it. Well, before they ever left the Valley, they'd already agreed to divvy up that Nigel Anderson was going to get at least a thousand dollars. Jose Torres was going to get a thousand dollars. Albert Gonzalez was going to get at least 500 bucks and possibly a car that would be worth his $4,000. So they really want you to believe that Fernando Cabrera made an agreement that he was going to take three other guys to go up to the Metroplex to pick up some money and lose money in the process. It just, it doesn't fit. And so for those reasons, we believe that count three is insufficient. And while I do have about a minute before of my original eight minutes here, I would go back to the Travel Act case. There, I would remind the court that we objected to these WhatsApp messages that Judge O'Connor provisionally allowed him because this was a bench trial and because he wanted to look at them later to see if there were, he was going to sustain the hearsay objections that we made to the reason why on cross, I went through with Fernando Cabrera and had him highlight all of the messages in which were made in furtherance of this conspiracy to pick up the money. That's what is admitted as defendant's exhibit number one. And so in the court's order, it said that, hey, we sustained the defendant's objection to that exhibit, and we have not taken into consideration any of those hearsay statements. But if you look at defendant's exhibit number one and you compare that to the Travel Act, there is no mention of drug trafficking in there. There's no business enterprise stuff. You're left with Jose or Fernando Cabrera saying, I knew a guy from Mexico named Pancho, and he asked us to come up with some money. And for those reasons, we believe that counts two and three are insufficient. Thank you. Thank you, Mr. Pope. You save time for rebuttal. Mr. Lang. Good morning, Your Honors, and may it please the Court, Andrew Lang for the United States. First of all, I agree with counsel that this is a somewhat unusual case, but the facts can be boiled down to this. Anderson and Gonzalez agreed to help collect what they believe to be $20,000 in cash proceeds of drug trafficking, and they attempted to conceal the source of that where counsel began with the Travel Act. First of all, the evidence was unambiguous that a continuing drug trafficking business enterprise existed. Cabrera testified that he had known Pancho for years. He knew Pancho to be a drug dealer. Pancho had repeatedly tried to rope Cabrera into his drug dealing. Although Cabrera never had an opportunity to participate, that doesn't mean that there wasn't a continuing business enterprise that Pancho was running. Further, Cabrera testified that Gonzalez had actually met Pancho in person in Mexico and knew Pancho at least as an acquaintance, so the evidence is clear that Gonzalez knew what Pancho's business was. I do want to clarify one point. Both defendants' counsels stated on a couple of occasions that these WhatsApp messages are quote-unquote text messages, but they weren't. They were voice messages. And in fact, Cabrera testified that when he was exchanging messages next to Gonzalez, when they were having the initial conversation with Pancho, those messages were all via voice. So Cabrera was speaking them into his phone, and when he received messages from Pancho, he played them on speakerphone. So in fact, Gonzalez overheard all of those messages. They weren't just typed. So there's plenty of evidence that Gonzalez was aware of Pancho's drug dealing. Further, with respect to Anderson, as we argue in our brief, Anderson was a knowing and willing participant throughout the scheme from almost the beginning when he volunteered his car to drive the four of them to collect the money. And Cabrera testified that at least by the time they were in the car, it was unambiguously clear to all four of them that what they were on their way to collect was drug money. And in fact, Cabrera testified that he had specifically represented to the other occupants of the car that they were on their way to get drug money. You need to specify for us, though, when was the unlawful activity completed, and when did the money laundering scheme begin? So with respect to the money laundering count, the specified unlawful activity that law enforcement represented created these proceeds was extortion. So law enforcement represented via the victim of the kidnapping to the kidnapper that they were satisfying the extortionate demand by leaving these $20,000 in a parking lot. The specified unlawful activity that Anderson and Gonzalez believed they were helping to conceal was the drug trafficking, because they believed that as they were on their way to collect the money, the money was proceeds of drug trafficking. What do you do to the argument that when they picked up the money, insofar as drug trafficking is concerned, that was just the completion of any complicity in drug dealing? No, that is the end of the first transaction. So I take your honor to be asking whether they were really only participating in a single transaction. Is that a fair characterization? I'm just trying to go through the basic elements, if you will, for trafficking. And I'm not following the government's argument, at least insofar as I understand the Travel Act argument, but I'm having trouble with the balance of the argument. So with respect to the Travel Act, the Travel Act statute requires the government to prove that there was the use of this facility to promote or facilitate the promotion of a business enterprise involving narcotics. And the evidence here showed... I'm talking about laundering, of course. Oh, I apologize, your honor. Well, what are the elements of laundering? So with respect to the money laundering conviction, the government was required to prove that the defendants attempted to conduct a financial transaction involving property that was represented by law enforcement to be proceeds of specified unlawful activity, which this was, and that they attempted the transaction with the intent to conceal or disguise the nature or location of proceeds that they believed to be proceeds of specified unlawful Yes, that's correct. And that's the point at which I have trouble with your argument. I see, your honor. So the concealment here was the concealment of the proceeds through Zuniga's cell phone store. And I do want to clarify one thing that Gonzalez's counsel stated. That's a shift in position from what you argued to the district court, isn't it? And that's what I was about to clarify, your honor. It's not a shift in position. The AUSA did actually argue both. The AUSA trial argued they intended to conceal the money by spending it, or they intended to conceal the money as reflected in this plan that Cabrera and Pancho discussed to launder it through Zuniga's cell phone store. And our argument on appeal is that that plan A, that original plan to launder the money through Zuniga's cell phone store is what reflects their intent to conceal the nature or source of the proceeds. And we don't disagree with opposing counsel's reading of cases like Dennett. You're arguing that the boys are going to go out and buy themselves some clothes and do some shopping sprees. That's your argument? That's not our argument, your honor. That was one of the two arguments. That's one of the ways you made it to the district court, and you shifted away from that one. I don't understand why you would, but let me be clear. What is your argument today? Our argument today is that the transaction that they intended to engage in that reflected their intent to conceal was putting the money on cards, on prepaid cards, at Zuniga's cell phone store. That's the plan that Cabrera and Pancho discussed. That was never executed? No, it was never executed. But where is the attempt? Where is the substantial act toward that under your attempt? So, of course, attempt requires a substantial step. They discussed the plan, and this court can infer, although of course this is a circumstantial case, that Anderson and Gonzalez shared in that intent and had discussed the plan on numerous occasions. So first of all, the initial conversation via voice messages over Cabrera's speakerphone happens physically right next to Gonzalez. So this court can infer that he at least overheard it and agreed with it. Cabrera testified that Gonzalez is essentially his best friend. They go with each other everywhere. They live together inside Zuniga's house, and Zuniga, of course, is the owner of the cell phone store that they were going to use to launder the money. The evidence is very plain that they never intended to do anything about buying telephone cards or anything else. From the beginning, jumpstart, they want to steal the money and go spend it on themselves. So where was the substantial step? So I don't think the evidence showed that from the beginning they were going to steal the money. I think by the time they were in the car, Cabrera testified that he had discussed with Anderson and Gonzalez this plan to go buy clothes, to go buy— When they left home, when they first went down to Houston, before they started off on that drive at all, they had already abandoned the—they already had made a substantial step before they ever got to Houston, before they were diverted to Fort Worth. So I agree that the plan had changed by the time they were in the car, but there was an ample time between when the plan was originally articulated on October 7th and when they left McAllen ultimately for— Identify for me the substantial step they took toward laundering the money. And by the laundering, you point to the fact that Pancho had suggested that they buy these telephone cards, credit—I'm not sure exactly what that is, but— So I think the inference there would be that they're a prepaid sort of form of payment. Yeah, prepaid, yeah. At any rate, I think the inference—and again, this is admittedly a difficult and circumstantial case—but I think an inference can be drawn from the evidence that Anderson and Gonzalez had repeatedly discussed this plan to launder the money through Zuniga's store. They met at Zuniga's home, where Cabrera and Gonzalez lived, to discuss the plan with all the participants. They met again at Anderson's home to discuss the plan with all the participants. So I think the planning had advanced— When did they decide that they're going to steal the money? Again, the evidence showed that by the time they were in the car—again, that's October 12th, about five days after the original plan was articulated— Before they ever started driving. I'm not sure if it was before they started driving or as they were getting in the car, but at some point on October 12th, they changed the plan. But up until that point, I think that this Court can infer, especially given the standard of review, that the plan had been to launder the money through Zuniga's cell phone store. Well, there's also a distinction, though, and it's the word that Judge Higginbotham phrase he keeps using, a distinction between plan and a substantial step. And there's some evidence of planning, and some evidence of planning changed. But at some point, you need a substantial step towards laundering this money. And what is that? Don't tell us about the plan, don't tell us about the conversation, unless you're saying that is the substantial step. So just don't tell us anything else, but what substantial step was taken towards laundering? I think the substantial step here was after they had planned to execute this transaction through Zuniga's cell phone store, they were on their way to collect the money in order to have this conversation that Cabrera testified about, that, oh, never mind, we're not going to give Pancho his cut, we'll just keep it all for ourselves. But the fact— Implementing the plan of getting the money is implementing the overall plan of laundering it once they get it. Is that sort of the idea? I agree with that, Your Honor. I think that's a fair characterization. It may not be a good statement of the law, though. But I think this is somewhat similar to Barnes out of the Seventh Circuit, which we discuss at page 19 of our brief, where the defendant had made a plan to engage in a financial transaction where the defendant didn't possess the drug proceeds but was going to, I think, sell property in exchange for drug proceeds, and he was out the door on the way to execute that transaction. And the Seventh Circuit in that case held that that was enough to show a substantial step toward money laundering. So here, again, it's a close case, it's a difficult case, but Anderson and Gonzalez shared in this plan and they were on their way out the door to go execute it. At some point when they were in the car, the plan did change, but the fact that they had this intent that they shared with Zuniga and Cabrera and were going to go execute the plan is enough. Let me return for just a moment to the Travel Act because I do want to put a finer point on carrion, which is the case from this Court that we discuss in our brief at 27. The defendants in their briefs cite this case as involving three separate transactions, but we, and I think the District Court, cite carrion because a co-defendant, Defendant Solmore, was only involved in aiding and abetting a single transaction. The evidence in this case is actually very similar to the evidence introduced with respect to Solmore discussed in carrion because there was evidence that these defendants were only participants in a single transaction, but there had been other transactions and they knew the source behind the transaction. They knew Poncho, and certainly there's ample evidence from which to infer that they understood that Poncho's occupation was as a drug dealer. Let me also touch on Section 880, which Counsel for Anderson mentioned. This is, we agree, an issue of first impression. The government is not aware of a case interpreting the knowing requirement under Section 880. It doesn't seem to be applied very often, but although it's an issue of first impression, it's not a difficult issue. Congress made it very plain that the mens rea requirement is knowing the same to have been unlawfully obtained. If Congress had intended to require the government to prove knowledge of extortion, that would have been a trivially easy requirement to add to the statute, but the knowledge requirement is simply knowledge that the property was unlawfully obtained, and we have that here. The defendants believed that the property came from drug trafficking when, in fact, it was the proceeds of this extortion at stake. What do you do with occasion when Justice Alito's opinion that talks about conspiracy, that you need more than you might need to show the underlying commission of the crime, although conspirators must pursue the same criminal objective and not agree to commit or facilitate each individual part of the offense, but a defendant must reach an agreement with the specific intent that the underlying crime extortion here be committed? Now, I've sort of brushed through some things, and I may not have spoken that clearly, but you know Ocasio. How do you get around the language of that opinion, which seems to say when you're talking about conspiracy, you must show that this conspirator that you're trying to convict knew of the underlying objective of the conspiracy, even if he didn't know each individual participant, each individual act regarding it? I certainly agree with Your Honor that the conspirator has to know of the objective of the conspiracy. But the objective of the conspiracy, which is to say violation of Section 880, is receipt or possession of proceeds that are proceeds of extortion, knowing the same to have been unlawfully obtained. So they did— But Ocasio says the fundamental characteristic of a conspiracy is a joint commitment to an endeavor which, if completed, would satisfy all the elements of the underlying substantive criminal offense. And the count that you indicted him on extortion, on this conspiracy to commit extortion, mentioned that, and mentioned not to commit extortion, but to get the proceeds from it. Specifically, we mentioned the crime of extortion. So your reading into Ocasio seems to me that what looks to me to be specific language of what crime is being talked about, he's just talking about if you're applying it to this activity. And I don't know if that's a fair reading. Well, I think it's a fair reading of the statute. And I think if they had completed the objective of the conspiracy, that is to say if they had possessed the money that they thought they were on their way to possess, then they would have completed the offense under Section 880. They would have received or possessed money that was, in fact, proceeds of extortion, but that they believed was unlawfully obtained. And the statute doesn't impose a more specific mens rea requirement than that. So had they completed the conspiracy, had they gotten the money that they believed they were on their way to pick up, they would have violated Section 880. But, of course, they didn't because they were arrested on their way out of the car. Unless this Court has any additional questions about these topics or about the sentencing issues, we submit in our brief, and thank you. All right. Thank you, Mr. Lane. Mr. Davis, you've saved time for rebuttal. Thank you, Your Honor. The point—well, let me mention one thing at first here. There's some confusion about what WhatsApp messages are. It is an app that you can install on your smartphone. You can send voicemails through it, but it also functions as a text application. And so I want to make clear to the Court that while there are some voicemails that were exchanged between Cabrera and Poncho through the WhatsApp message—or WhatsApp system, not everything. In fact, the majority of those messages between them were actually a text-type message. Yes, there were some voicemails exchanged between the two of them, and yes, some were played where others could hear them, but we don't know which ones those were or how many there were. Well, the evidence was that Anderson and Gonzalez were roommates, and they were lying in the same bed when the voice message came in. Not Anderson, Your Honor. That would have been Gonzalez and Cabrera. Yes, sir. And that's an important distinction there because, unfortunately, Mr. Gonzalez may be a little bit closer to Cabrera and Poncho than Anderson is. There's no connection here shown in this evidence between Anderson and Cabrera or Poncho. And so even if Mr. Gonzalez is closer to this, there's no evidence that Anderson had any knowledge about anything between Cabrera and Poncho or even knew that Poncho existed. And then, of course, there's the question about, is it really a continuing business enterprise involving Cabrera if he never did know anything about Poncho in Mexico? So why are they going to pick up this money? I don't find myself trying to follow that argument. Well, this is a one-off deal by Anderson and at least Torres and probably Gonzalez just to go— I thought there was abundance of evidence that the participants all knew this was money coming from Mexico. Some thought it was drug money. Some thought it may have— No, sir. I think that—I don't believe there's any evidence to suggest they knew it was from Mexico. I believe they all believed it was illegal drug proceeds. They all believed that. Why isn't that enough? Well, because, number one, a one-off occurrence doesn't fit the Travel Act. A single activity is not what the Travel Act is designed for. And there's a question, do they even know that there is that CBE between, you know, Poncho and maybe, arguably, Cabrera? And, of course, that's not what really happened in this case. This was not a drug activity. This was extortion. Well, I thought it would be necessary to—or sufficient to establish that Anderson and Gonzalez knew that they were, what, participating in a broader criminal enterprise, a broader criminal enterprise. And that's enough under the Travel Act, I think. Well, we would disagree with the suggestion that they knew they were participating in a broader— Well, that's not an assertion on my part. That appears that there's evidence there. I want you—I invite you to tell me why it's not—that's not—that's not right. Well, of course, that gets to the whole objections that we had to— Wherever it gets to, where is it? Government's Exhibit 8 is that the vast majority of Government's Exhibit 8 has to do with just stuff between Cabrera and Poncho that there's no indication that the other kids knew anything about. And the only thing in Government's Exhibit 8 that's, you know, Defense Exhibit 1 pertaining to going to pick up this money is what was highlighted there in Defense Exhibit 1. And so if Nigel Anderson or Albert Gonzalez knew that there was a bigger activity and knew that they were participating in it, then that's problematic for us. But this appears to be a one-off joyride to go around, make some money, maybe steal some money, maybe buy some clothes, and we think we're picking up drug money, but there's nothing to indicate, certainly with respect to Nigel Anderson, that he knew anything about Cabrera's and Poncho's relationship. And as I alluded to a minute ago, there's a real question in my mind whether this actually constitutes a continuing business enterprise when Poncho has never done any kind of drug dealing—or, excuse me, Cabrera has never done any kind of drug dealing for Poncho. It's just Poncho. Your time has expired now, Mr. Davis. Yes, sir. Thank you, Judge. You know, the government briefed—or inadvertently has conceded to a large part of my argument with regards to the money laundering camp. The government got up here and they said that—and I think in response to Judge Higginbotham's question—that this money that was being paid was to satisfy the ransom. If it's satisfying the ransom, therefore it doesn't meet the requirement of being represented to be the proceeds of specified unlawful activity. Because it can't become proceeds of specified unlawful activity until the ransom has been satisfied. And so without that, there's no—this is not a financial transaction under the money laundering statute. And I would—to go back to their argument about this plan to go through the cell phone store, when you look at the WhatsApp messages, whether it's text messages or voice messages that are being translated here, you can see and you compare that to the testimony of Fernando Cabrera. Cabrera says that, look, the reason why I told Poncho in Mexico that the guy going with me was a 14-year-old kid, because whenever I stole the money, I didn't want him coming looking for anybody else. He would think that it was just me and some kid. The plan from the very beginning that Cabrera articulated at trial was, we're going to steal the money. We're not going to put it through a cell phone store. It's steal the money. And so for those reasons, I mean, they haven't proved the concealment here. And then I guess to go back real briefly about this Travel Act stuff, Gonzales—there was testimony that Gonzales did meet Poncho one time, seven months before this incident occurred where he's—Cabrera was contacted by WhatsApp. But Cabrera testified that during that meeting, it was more of a meet and greet. Gonzales goes off to the side, and Cabrera and Poncho have a conversation. And Gonzales was not there for that. And so you have to look back at just the messages that are highlighted in Defense Exhibit Number 1 as the communications and the evidence that are used to determine whether or not there was a business enterprise proven for the Travel Act. Thank you. All right. Thank you, Mr. Poe. Your case is under submission. And we noticed that you and Mr. Davis are appointed counsel. We appreciate your willingness to take the appointment and for your good work on behalf of your clients.